Chief Justice Bibb
delivered the Opinion of the Court.
The circuit court dismissed Grimes’ bill with costs, and he appealed. ,
The principal question is, whether the transactions between complainant and defendant, grow out of a sale and purchase of the land and mills, by pa-rol, with an agreement for usurious interest cloaked under the form of a written instrument for rent, or a bona fide contract between lessor and lessee, merely for rent. Grimes alleges the, former, Shrieve the latter.
Shrieve had sold a tract of about two hundred and thirty-five acres of second and third rate land to Caldwell, and retained a lien for the purchase money. Grimes came into possession as a purchas *547 er from Caldwell. Shrieve instituted his bill in equity against Caldwell to subject the property to sale. Caldwell died insolvent. The suit was revived against his representatives. On the third of May, 1818, Shrieve obtained a decree, and order of sale to raise the sum of $6000 and upwards. The sale was made on the 3d of September, 1818; Shrieve was the purchaser. Grimes was no party in this suit.
AUpgationsof-nmes 1
Grimes alleges that, in May, 1818, Shrieve agreed to purchase the property at the sale to be made by the Commissioner; to let Grimes have it for the sum due Shrieve from, Caldwell, whose estate was insolvent; to give Grimes time, he paying ten per cent, interest, until the principal was paid, and then Shrieve was to convey the estate. Grimes alleges that the sum of $>908 52, due to him for building a house for Shrieve, was agreed to be discounted, as so much of the principal; that on the day of sale, the writings produced to him for his signature, were objected to by him; but upon the confidence he had in George Walker, (the subscribing, witness to the writing,) that it was all right, Shrieve only wanted his ten per cent, he did execute the writings in consequence of the verbal agreement, of wldch Colonel Walker was apprised, and was the attorney of Shrieve; that the balance due was calculated then at $5,225, as well as he recollects; that since Walker’s death, Shrieve has sold to Boyce; dispossessed Grimes; refuses to refund the $908 52; refuses to pay for the improvements made under faith of that agreement, although made with the piivity and knowledge of Shrieve; but has distrained for some of the nominal rents reserved, and obtained judgments for others. The claims of Grimes are l’or the $908 52, due him on settlement before the verbal agreement, and sunk in that purchase; for improvements, amounting to about $1000, or $1200; for $37, for manufacturing flour for Shrieve; and for moneys paid upon the distress warrants and judgment for rents &c. the prayer of the bill is for an account and decree for the balance due him, for relief against the usury, and for injunction against the proceedings on the judgment, distress warrants &c.
Answers of Shreve.
Shrieve denies any agreement to sell to Grimes; insists on the leases executed in 1818 and 1819, as bona fide, to secure a fair rent; he admits, that he did owe Grimes $908 52, for building his house, which sum he says was deducted from the amount due from Caldwell to him, that this sum when taken from the original amount of the decree, “being ‡6000 and upwards,” left a balance stated in blank; that “after he had received the quiet and peaceable possession of the property from the complainant, he did rent it tohim for the term of one year from the third day of September, 1818, and entered into a written agreement’’ — -“and at the expiration of the year or thereabouts, a settlement was had” — “for that year’s rent, and after making the allowance for repairs &c. which the complainant said had been done agreeable to contract, there was due this respondent $-, as a balance of that year’s rent, for which balance the complainant confessed a judgment” — “at the October term, 1819” — “that he rented the land and mill another year, after the expiration of the first, upon the like terms, excepting lie required security for the 2nd year’s rent, which the complainant gave by a mortgage on two slaves;” he admits payments towards the rent of $100, in October, 1820, $96 in January, 1821; he admits he sold to Boyce in 1821; he says that the complainant replevied the whole rent due up to the 3rd of March, 1821, and that without any thing said during all that time about t#ury, and purchase alleged in the bill; he denies that the complainant ever made any valuable improvements “with his assent or knowledge;” that “the bridge or foot way was up so that they passed over,” (from one mill to the other, they being on opposite sides of the creek,) “before this respondent knew that it was about.” In answer to one of the supplemental bills, Shrieve exhibits a letter to him of January, 1821, in which Grimes said: “Í would prefer giving you one thousand dollars a year well secured, and on failing to pay punctually, to pay interest from the date in preference to the enormous interest that I am paying, for I find there is double the amount of repairs wanting, and ought to be done, above what we agreed on, and in changing the thing I should be at liberty to do as I pleased.”
Agreement between the parties of the optena“
paro] evi_ dence and and cir-^1'ns.lan<r,e3’ pretended renting was cloalt: saic°by parol an interest of 10 percent. of real estate, and corrupt contract for forbearance of the price at
*549 The agreement of the 3d September, 1818, reites that Shrieve “hath this day purchased the lands and mills on Hickman creek; now in possession of said Grimes, and sold by George Walker as commissioner, and in pursuance of a decree of the Jessamine circuit court in favor of said Shrieve, against the heirs and administrators of Thomas Caldwell, deceased; now it is hereby agreed between the said parties,” (Shrieve and Grimes,) “that the said Grimes hath this day rented the aforesaid land and milis, with all the appurtenances just as said Shrieve purchased them, the said Grimes having first given said Shrieve full and complete possession, under his purchase. The said Grimes this day receives the possession of the aforesaid property of said Shrieve as his tenant, and hereby agrees to pay the said Shrieve, seven hundred and fifty dollars, as rent for the use, benefit and enjoyment of said property for one year from this date, and has passed his notes to said Shrieve at three, six, nine and twelve months for $187 50 each.” Grimes agrees to return the said property to said Shrieve at the end of the time, “that is ,on the 3rd day of September, 1819, in as good order as he receives it, not to commit waste, nor suffer any waste or improper destruction of timber” — “but should any necessary and leasing improvements or repairs be required"in the opinion of said Grimes to said mills during said Grimes’ time, the said Shrieve doth ,.hereby agree may be made toan amount not exceeding $226 80, and the same tobe deducted out of the last payments of the rent aforesaid.”
(Signed,) “ William Shrieve,”
ilBenj. Grimes.”
“Teste, Geo. Walker.”
It appears that after the purchase by Shrieve, under the decree, Grimes remained in possession from 3rd September, 1818, the day of the sale and-lease, up to the 3rd of March, 1821; during that time, G-rimes made repairs and improvements on the dwelling house and appurtenances, paled the garden, roofed the houses, built new ones, cleared tend, fenced, repaired the mills, erected a bridge *550 across the darn to connect the saw and grist mills, repaired the dam, abutments, &c. &c. of such stamp and labor and cost, as no renter from year to year would be expected to sustain, and proclaiming the actings and will of an owner, not those of a mere tenant for a year. These improvements were made under the observation of Shrieve, they were on the road where lie was continually passing and repass-jug; he saw them in progress, he was on the ground whi\st tlie clearing was going on; he. saw the bridge as it was erecting, and pronounced it beneficial; he did not fdrbid the waste of cutting down the timber and converting forest into arable land, which he now complains was wrongful. When Shrieve purchased under the decree, the cleared land was exhausted, the fencing decayed, the mills old and rotting. After all the repairs to the mills by Grimes, Shrieve produces testimony, that many more were wanted. The rent of seven hundred and fifty dollars was enormous; reduced to a money rent of ‡523 20, by the allowance of $226 80 for repairs, the casement to a tenant from year to year was but nominal, coupled with the burthen of returning it in repair. Throwing aside the sum of $226 80, for “necessary and leasing improvements or repairs,” for the rent is reduced to $523 20, too much for the tenant who was to keep up repairs of such a property; but approximating very nearly to ten per cent, on the balance on Caldwell’s mortgage, as stated by Shrieve, after deducting the $908 52; and as stated by Grimes to have been calculated on the day of subscribing the lease, and not gainsayed by Shrieve. That “necessary and leasing improvements or repairs” — “to said mills,” should he referred to the “opinion of said Grimes,” as the mere tenant, “to an amount not exceeding $226 80” — “to be deducted out of the last payments” of the four notes, are provisions which give a latitude of discretion to the tenant, ill-suited to the conduct of a landlord who really thought $750, but a fair and reasonable rent, but well suited to the condition of the parties as seller and purchaser upon the terms set forth in the bill. The limit of $226 80, for improvements and repairs, is curious, as not calculat *551 ed in reference to known and designated repairs, or improvements, but to such as may be required “in the opinion of said Grimes.” This ultimatum for improvements and repairs, ending in such fractional exactness, evidently was not the result of calculation founded on the improvements and repairs themselves. It is a surplusage, a remnant, falling off from a computation of that which did admit of arithmetical accuracy. The balance of the money due Shrieve, after deducting the sum of $908 52, and the annua] interest at a given rate upon that balance, did admit of such exactness. Unknown improvements and repairs did not. The sum of $908 52, deducted from the decree for upwards of $6000, say $6,140 52, would leave $5,230, for the balance due Shrieve, the interest on that balance for one year, at ten percent, would give $523 20, which deducted from the whole nominal rent of $750, would leave $226. 80, as a remnant for repairs and improvements, the whole a cloak to cover the usury. The debt of $908 52 due Grimes, is acknowledged by Shrieve. He does not pretend any satisfaction of that debt to Grimes, other than by crediting it on the decree against the heirs and administrators of Caldwell. Why he should so carry it to that account, Shrieve has not explained. No co-lourable pretence for such application is suggested, other than that assigned by Grimes, viz: an' agreement between him and Shrieve, for the sale and purchase of the estate, for the amount for which Shrieve held the lien. Grimes was no party to the decree. That he should voluntarily pay $908 52 for Caldwell’s heirs and administrators, (the estate being then insolvent, and the property which he had purchased from Caldwell being then under the incum-brance to Shrieve,) without any consideration whatever, cannot be believed. The deposition of Staples explains how that matter was, very satisfactorily. He says, Shrieve., Grimes and Colonel Walker, (who was the commissioner appointed to make the sale,) were talking together a considerable time before the sale. Colonel Walker enquired of Grimes if be should credit the debt due Grimes from Shrieve, Grimes replied, under the considera’ *552 tion of his holding the property he might do it;' Walker then named it' to Shrieve; that it wasso applied is acknowledged by the answer to the bill. He farther states that “he fully understood by William Shrieve and Colonel Walker, and Benj. Grimes, in their conversation, that said Grimes was to hold the property by purchase,” on a contract that had been theretofore agreed on, as to the terms of the sale; “Grimes was to pay ten per cent.” The deposition of Ewing states, that Colonel Walker had informed him before the sale, and on the day after the sale, that Grimes was to get the property by paying the money due from Caldwell to Shrieve, and ten per cent, per annum, fill the debt was settled. This matter was afterwards communicated by Mr. Ewingto Shrieve; he gave no decisive answer, to the enquiry of Ewing, who was prompted to make it by reason of a debt that Grimes then owed him. The testimony of Mr. Turner, shows that Grimes objected to signing the lease and the notes, because not expressive of the understanding between them, that Grimes was to have the property by paying ten per cent, on the principal, until it was paid, and that he was induced to sign them by the explanation of Col. Walker. By the testimony of Gibony, Staples, Joseph Crockett, Mrs. Rick-etts and Turner and others, it appears that the writings were riot drawn after the parties met on the day of sale, but were previously prepared and produced by Shrieve. The statement in the answer, “that after he had received the quiet and peaceable possession of the property from the complainant,” he rented it to him &c. is founded exclusively upon the expression in the lease, that Grimes had delivered possession on that day. That paper was a previously prepared declaration; the foreboding of a fact that never happened. It exists on paper only. Grimes did not in fact, nor in intention surrender the possession, until,he found the verbal agreement had been violated by the sale to Boyce.
As to the full settlement of accounts relied on in argument, it is sufficient to say, that it is inconsistent with the answer. No settlement, other, or further, than according to the lease, is alleged by the *553 answer. All claims inconsistent with the lease, are repelled by Shrieve; the answer insists on that; pretends no settlement but according to it; acknowledges payments, distress warrants, and replevin bonds, and judgments, for the full rent due by the lease, up to the 3rd of March, 1821, denying all pretensions of a verbal sale, and of usury as unfounded and unheard of by him at that time. That he had heard of the sale and of the ten per cent, and that it was the basis of the lease of 1818, appears by depositions of Staples, Ewing, and Turner, and by the letter exhibited by himself. That letter proposes to change the arrangement, so as to pay $1000 per year, and to secure it in preference to “the enormous interest.” That letter cannot be considered as a proposition to increase the rent, but as a proposition to get clear of the enormous interest he was paying, covered s.nd reserved under an exorbitant rent, with short allowance for repairs.
Usury may be averred against all private agreements, bonds, deeds, & even fines levied ' may be thus avoided.
Usury often cloaked under the name of rents of property leased (oboN rower or lender. -
A party is not concluded by the usurious deed or security, from showing by external circumstances that the contract is corrupt. Usury maybe averred against all private contracts, bonds, deeds and writings; even a line levied upon an usurious contract may be avoided by averments. (Fermor’s case, 3 co. 80; 5 co. 69—6; Fountaine vs. Grimes, cro. Ja. 252.) It is not the form or expression of the agreement, hut the nature and intent of it, which must determine whether the contract be a shift to get more than legal interest, and colourable only to evade the statutes.
Usury may be by the reservation of interest as rent, on a lease made by the lessor, so intending to get interest, to the lessee, at an unreasonable rent, or by obtaining a beneficial lease at an inadequate rent. (Bedo vs. Sanderson, Cro. Jac. 44; Shep. Touch. 62; Drew vs. Power, 1 Schoa. and Lef. 182; Brown vs. O’Dea, 1 Sch. and Lef. 115.) Every shift, device or subterfuge, which the art or ingenuity of man can invent, to take unlawful interest, either directly or indirectly, or by any shift, or deceitful way or mean, is included in the proposition of ths statute.
Previously existing debts or any commodity owing or advanced, may be the subject of an usurious contract.
Courts of e-quily have not laid down any general rule beyond which they will not go, in detecting usurers, least the 'usurers might thereby learn to avoid detection.
.Recapitulation of the facts of the transaction.
Neither are cases of usury confined to precise loans of money;but they extend to cases where the relation of debtor and creditor exists, and to cases of wares, merchandize or commodities. Drew vs. Power, 1 Sch. and Lef. 191-2; Hamond vs. Alexander, 1 Bibb, 333; Logan vs. Heytle, 1 Marsh. 530; Shanks vs. Kennedy, 1 Marsh. 65; M’Ginnis vs. Hart, 4 Bibb, 328; Richardson vs. Brown, 3 Bibb, 207; Knox vs. Black, 1 Marsh. 299. Exorbitance of price imposed upon a person obtaining a loan or forbearance, or inadequacy of price of a thing given by way of premium for forbearance or loan, are always liable to suspicion, and give a contract the appearance of usury. No one has a right to take advantage, of the embarrassments or distresses of another, to impose upon him exhorbitant terms for a loan or forbearance.
In Lawley vs. Hooper, (3 Atk. 279.) Lord Hardwick said, “there has been a long struggle between the equity of this court, and persons who have made it their endeavor to find out schemes to get exhorbitant interest, and to evade tbe statutes of usury. The court very wisely hath never laid down any general rule beyond which it would not go, lest other means of avoiding the equity of the court should be. found ont. Therefore, they always determine upon the particular circumstances of each case, and wherever they have the least tine-ture of fraud in any of these oppressive bargains, Relief hath always been given.”
In the present case, the complainant was in possession, as a purchaser from Mr. Caldwell; the defendant had a lien for a large sum due from Mr. Caldwell; he died insolvent; the defendant obtained a-decree of sale to raise his money; the complainant not wishing to quit the premises, applies to purchase of the defendant, but asks time for payment; the defendant agrees to sell and give time at an interest of ten per cent. On the day of sale, the defendant comes with his writings ready drawn; a lease for a year at exorbitant rent, far above the ten percent, with a clause of allowance for all above his ten per cent, to be paid in repairs and improvements at the will of the tenant; if he repairs and *555 improves, no matter to what amount, only the excess above the ten per cent, is allowed; if he does not repair or improve, the whole rent is to be paid; with covenants to commit no waste, nor suffer any to be committed; tobe careful of the orchard; not to suffer it or any other part of the property to be abused, and to return the property at the end of the year, in as good order as he receives it, with four notes for the $750 rent. The defendant purchases the estate at the sale; his writings are presented; the complainant objects that they are not expressive of their agreement; but his apprehensions are quieted; the ten per cent is all that is intended to be secured; the defendant obtains a credit for a debt he owed the complainant of $¡908 52, as so much paid upon the parol agreement of sale and pui’chase; at the end of the year, the lease is renewed for another year. The complainant under faith of the pa-rol agreement labored most industriously, in repairing and improving an estate which he supposed he had purchased; and so labors for two years, expending great care, diligence and means in repairing and improving. The defendant sells the estate to another, turns the complainant out of possession, at the end of two years and a half; compels him by warrants and other process, to execute replevin bonds for the whole rents up to March, 1821, which at the rate of $750, per year, amount to $1875.
Usurers pre» tenses.
Expose of the hardships of the agree*ment as insisted on by the usurer
When the complainant comes into equity for relief ana an account, the defendant answers, and relies upon the lease, and says he has settled agreeable to it; attempts in proof, that the complainant left the nulls in worse condition than he received them; denies even to refund the $908 52, or to credit it against the rents.
According to this defence, (if allowed to prevail,) although the complainant has been faithful and diligent in care and labor to better the estate, has expended in repairs and additions a large sum; yet for this, be can have no allowance, because they have not kept pace with the natural wear and tear of the mills, which were very old and. rotting; he must pay the rents to the amount of $1875, with some *556 abatement already made, (how much not known,) not exceeding the ultimatum of $226 80, fixed upon in the lease. Without going into details, it maybe safely affirmed, that the care, labor and expense employed by the complainant, in efforts to better the estate, have greatly exceeded in value the use and occupation. Yet according to the written terms, he is bound to pay, (after throwing off the allowance annually of $226 80, for repairs and improvements,) rents at the rate of $522 20 per year, amounting to $1208. He believed himself a purchaser, but the writing says, mere lessee; he expended his means in repairs and improvements; believing them laid out for himself; but the writing says, the premises are to be returned in as good order as yon found them; no matter how much above $226 80, per year was required, or expended to keep them so, and beyond ‡226 80, no allowance can be made.
imfsosition on the boi rower and unfairness of the transaction exposed.
The complainant has been inveigled into a situation in which he was induced to believe he was a purchaser, and that the writings were intended only to secure the exhorbitant interest of ten per cent, on the purchase;but the writings bind him in terms yet more exhorbitant; the rents are more exhorbi-tant than the ten per cent, and covenants to return the premises in good order, as contained in the lease and applied to the condition of the property, were yet more exorbitant; but as if this were not enough, the defendant claims further, (as a gratuity,) that his debt to the complainant of $908 52, is extinguished. Under colour of the verbal agreement, the defendant procured the assent of the complainant to apply the debt of $908 52, as so much paid towards the purchase, and procured the execution of the writings, by which the complainant was bound to very exorbitant terms; by the writings every thing to the defendant is made sure, every thing for the complainant is left to depend upon parol. Under the influence of the parol and written agreements, the defendant keeps the complainant in possession, encouraging him to dress up the estate by repairs and improvements to a vendible condition; as soon as that is done, the defendant sold the estate to Mr. Boyce.
Courts of e-(iuibJ wil1 tIe" sation°forPfm-provements made under ^rof1 ur°f & chase,^which vendor re-j,“s“to exe"
Held the transaction the^eposi-^ tions and cir-answer to ° have been an usurious mid geement&nd the party entitled to re-pensation°tbr all his improvements “^ke^ro5-erty.6 PI°P
Under all the circumstances by which the defendant procured the writings to be signed by the complainant, this court ought not to suffer such writings to stand, nor any settlement under them as claimed by the answer.
In answer to a supplemental bill, touching the connnon law action and damages assessed for the improvements, the defendant has suggested, that this court, in reversing that judgment, has decided that Mr. Grimes “was not entitled to recover a farthing” for those improvements. This is a mistaken construction of that opinion, if intended as a defence to the claim in equity. The case is reported in 4 Litt. 220, and certainly furnishes no plausible pretext for the party or his attorney to put such a suggestion into an answer to a bill in equity claiming compensation for those improvements. That a court of equity will decree compensation for improvements made under faith of a parol agreement against the vendor who violates the agreement, has been frequently decided. M’Cracken vs. Sanders, 4 Bibb, 511; Fox’s heirs vs. Langly, 1 Marsh. 388; Hamilton vs. Hamilton, 5 Litt. 28; M’Campbell vs. M’Campbell, 5 Litt. 94; Thompson vs. Mason and wife, 4 Bibb, 195.
Upon the whole of the facts and circumstances, this court is constrained to say, that the answer is outweighed by the proofs, not only in several of the subordinate parts of the defence, but also on the principal question. The lease of 1818, is liable to suspicion on its face. Compared with the extraneous facts and circumstances, it was a device to cover the usurious agreement for interest at the rate of ten per cent. The depositions of Staples, Ewing and Turner, are all confirmed by the acknowledment in tile answer, that the debt to Grimes of $908 52, was applied to the account of the decree in favor of Shrieve against Caldwell’s heirs and administrators, án d leave no doubt of the usurious agreement and contrivance by which Grimes was drawn in to sign the writings. Under faith of the parol agreement, Grimes went on to make repairs and improvements which no tenant from year to year would have *558 made. They were made under the very eyct of Shrieve, andjsuperinduced by the usurious agreement. Shrieve has sold the estate to another. He is bound by the established principles of equity, to repair the losses which Grimes has thus sustained in labor and expense bestowed upon the estate in repairs and improvements, not compensated by the use and occupation fairly estimated for the time that Grimes has enjoyed the estate, and to account for the moneys which have been paid under that agreement; and to that end the circuit court ought to liave directed an account to be taken of debits and credits between the parties on the matters of the. bill.
Decree and mandate for an account to be taken of the repairs, improvements and rents of the estate, and for a decree for balance in complainant’s favor.
It seems to this court, upon the bill, supplemental bills, answers, exhibits and proofs, that the transactions therein mentioned, grew out of, and are founded upon a usurious agreement of 1818, by which the defendant reserved to himself, and intended to secure an interest at the rate of ten per centum per annum, forgiving day for payment of the price of the land and mills on Hickman Creek; that the real contract was by parol for the sale and purchase of the estate; that the writings were but devised to cover and conceal the usury, and imposed upon the complainant, terms more exorbitant and unconsci-entiousthan even the usurious agreement; that the defendant, having sold the estate to Mr. Boyce, and dispossessed the complainant, ought, therefore, to account to the complainant for $908 52, paid towards the principal, with interest thereon, from the third day of September, 1818, to be computed after the rate of six per centum per annum, up to the time of rendering the decree to be pronounced herein; and for the sum of $87, proved by the depositions, and acknowledged and credited by the defendant, after the decree of the circuit court; and for the repairs and improvements made by the complainant; and lor all moneys paid, or collected, under the, proceedings complained of in the bill and supplemental bills mentioned, and alluded to — against which the defendant is entitled to an account for the reasonable rents and profits of the estate, during the use and occupation of the complainant; *559 and as to the rents and profits, and repairs and improvements, and ail the other matters, that they be referred to a commissioner or commissioners, to ascertain their value, and to state and report; and for the balance which may appear in favor of the complainant; he is entitled to a decree against the defendant, with injunction against the proceedings on the judgments, decrees, warrants of distress, and replevin bonds in the bill mentioned.
Haggin and Loughborough, for appellant; Critten-den, for appellee.
it is, therefore, ordered and decreed, that the decree- of the circuit court be reversed, and that the cause be remanded for proceedings according to the principles of this opinion, and for such other, as the usages and principles of equity may authorize and require.
And it is further ordered and decreed, that the appellee pay to appellant, his costs in this behalf expended.